JAOPLIMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              19 CR 651 (LTS)

NIKOLAOS LIMBERATOS,

        Defendant.

------------------------------x

                              New York, N.Y.
                              October 24, 2019
                              11:20 a.m.

Before:

                HON. LAURA TAYLOR SWAIN,

                              District Judge

                    APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
ROBERT B. SOBELMAN
SAMUEL P. ROTHSCHILD
DANIEL LOSS
    Assistant United States Attorneys

KARLOFF C. COMMISSIONG
    Attorney for Defendant

ALSO PRESENT:   PRETRIAL SERVICES OFFICER JOSH ROTHMAN
                TASK FORCE OFFICER JOHN HOFFMAN
                TASK FORCE OFFICER JOHN REUTHER

JAOPLIMC

1          (In open court)

2          THE COURT:  Good morning again.  Would everyone other

3     than counsel please be seated.

4          (Case called)

5          THE COURT:  Since we're starting a new transcript,

6     counsel, your appearances again.

7          MR. SOBELMAN:  Robert Sobelman, Samuel Rothschild and

8     Daniel Loss for the United States, and we're joined at counsel

9     table by Task Force Officers John Hoffman and John Reuther of

10    the Federal Bureau of Investigation.  Good morning, your Honor.

11         THE COURT:  Good morning.  And from the Pretrial

12    Services Office, we have Officer Joshua Rothman here.

13         MR. ROTHMAN:  Good morning, your Honor.

14         THE COURT:  Good morning, Mr. Rothman.

15         MR. COMMISSIONG:  Karloff Commissiong on behalf of

16    Mr. Limberatos, who is standing next to me, your Honor.

17         THE COURT:  Good morning, gentlemen.  Please be

18    seated.

19         So this is the government's appeal of the bail

20    determination made by Judge Wang in October.  I don't have the

21    precise date in front of me.  I received the government's

22    letter appealing that bail decision.  I have reviewed it.  I

23    have also reviewed Mr. Commissiong's memorandum in opposition,

24    and I've reviewed the transcript of the proceeding before Judge

25    Wang and the pretrial services report --

JAOPLIMC

1          MR. COMMISSIONG:  Pardon me.

2          THE COURT:  -- concerning -- yes?

3          MR. COMMISSIONG:  Pardon the interruption.  I just

4    wanted to make one small correction.  I stated in the letter

5    that he has an 11-year-old daughter and a 15-year-old daughter.

6    He has a 15-year-old daughter and a 17-year-old daughter.  The

7    15-year-old daughter, who I referenced with respect to the

8    medical records, that's correct.  The 17-year-old daughter is

9    the daughter with whom he scouts colleges with.

10          THE COURT:  I was thinking that the 15-year-old was --

11          MR. COMMISSIONG:  A bit young.

12          THE COURT:  -- both energetic and precocious.

13          MR. COMMISSIONG:  Thank you, your Honor.

14          THE COURT:  All right.  Thank you for straightening

15    that out.  I went to college when I was 16; so it's not

16    impossible, but although, not necessarily typical.  So thank

17    you for that correction.

18          So I have an obligation to make a determination

19    *de novo*, but I have read the record of the proceeding

20    beforehand; so I am not unfamiliar with the arguments and the

21    evidentiary proffers upon which those arguments rest.

22          I understand that it is the government's position that

23    it is risk of flight that warrants detention here.  That burden

24    is a preponderance of the evidence.  The government is not

25    making a danger to the community argument.

JAOPLIMC

1          So I'm going to ask the government to start off and

2     ask that, in the government's remarks, you focus me on any

3     evidence that you have showing Mr. Limberatos, himself, as

4     opposed to participants in the conspiracy generally, as having

5     access to significant funds and/or fraudulent travel documents

6     that point to a likelihood of flight, notwithstanding

7     conditions and the combination of conditions that have been put

8     in place.

9          MR. SOBELMAN:  Yes, your Honor.  If I may, your

10     Honor's obviously familiar with the record.  I won't repeat the

11     arguments we made either in our submission or at the bail

12     hearing.  I'd like to take a moment, before I turn to your

13     Honor's question, to just respond to some of the things that

14     were in Mr. Commissiong's letter --

15          THE COURT:  Yes.

16          MR. SOBELMAN:  -- that was filed yesterday.

17          First, your Honor, one of the grounds that he relies

18     on for stating that he would not leave the country is -- I'm

19     sorry, your Honor.  One of the things he talks about is that,

20     well, even if he goes to Greece, the government could extradite

21     him.  That rests on a false premise.  Greece, as a general

22     rule, does not extradite their own citizens.

23          Just yesterday Judge Cote, in a fraud case, ordered

24     that a defendant be detained pending trial on risk of flight

25     grounds.  The case is *United States v. Telemaque Lavidas.*

JAOPLIMC

That's T-e-l-e-m-a-q-u-e, L-a-v-i-d-a-s.  It's 19 CR 716.  That

gentleman is actually an American citizen but has Greek

parentage.  His parents were from Greece, and one of the

factors that Judge Cote rested her decision on was that because

he could flee to Greece, then obtain Greek citizenship, due to

his parentage, and therefore, not be extraditable to the United

States was one of the principal factors she relied upon that is

a risk of flight.

Here, we are not dealing with an American citizen.  We

are dealing with a Greek citizen.

THE COURT:  Before we go away from the Lavidas case as

precedent, is that a person who had family, children, job,

property here in the United States and other strong ties to the

area?

MR. SOBELMAN:  Yes, your Honor.  He worked here.  He

had a job.  He had -- I believe he had either one or two

children.  He wasn't facing a mandatory minimum, which I'll

note.  He did have some extensive travel, but I believe he did

have children.  It's not my case.  I'm not familiar with all

the facts, but I did --

THE COURT:  The facts are important.

MR. SOBELMAN:  No, I understand, your Honor.  I'm just

familiar -- I raise it not that it's the same case, or they're

even necessarily the same in every way, but I raise it just to

make the point about the Greek citizenship issue and the

JAOPLIMC

1    extradition point that defense counsel raised is false.  It is

2    baseless.

3         He cannot be extradited from Greece.  They have a

4    general rule regarding extradition.  So if he can successfully

5    get there, he is done, he is free, and that is a huge problem

6    both for defense counsel's argument and for the government,

7    should he leave the United States.

8         Another point that defense counsel raises in the

9    submission is that he wouldn't leave his daughters.  First of

10   all, his daughters could relocate to Greece more easily than he

11   could spring himself from jail, should he be sentenced to a

12   lengthy term of imprisonment, which we expect to occur in this

13   case.

14        People leave their children for these same reasons not

15   infrequently.  Just last week, a defendant named *Rosa*

16   *Rodriguez*, in case 19 CR 729 was granted bail in large part

17   because she had a seven-year-old son that she had to care for

18   and claimed that she had no one else that would be able to take

19   care of him.  Within a few days, she dropped the kid off with

20   someone else, at family or friend, and is believed now to be in

21   the Dominican Republic, where she was a citizen.  She did not

22   appear for her arraignment in front of Judge Aaron.

23        Again, different type of case.  It's not on all fours

24   here.  I'm not saying they are the same defendant, but it is

25   not inconceivable that Mr. Limberatos would rationally decide

JAOPLIMC

he would rather live out his life in Greece, than spend what

is, at least at this point, a mandatory two years, should he be

convicted, in federal prison before inevitably being deported

due to being convicted of an aggravated felony.  It's not

inconceivable that someone would leave their children.  Again,

a woman did it just last week.

        Mr. Commissiong relies heavily on the *Paulino* case.

Obviously, Paulino is a District Court case.  It's not binding,

just as Judge Cote's decision on the case yesterday is not

binding.  But Paulino is distinguishable on many grounds, some

of which are even in the block quote that defense counsel used

in his letter.

        For example, Paulino is an American citizen, not a

citizen of a foreign country that doesn't extradite their own

citizens to the United States.  He had no known travel history,

aside from travel as a young child, unlike this defendant, who

has a fairly extensive travel history.  And Paulino, unlike

this defendant, was truly indigent.

        The government, obviously, hasn't been privy to this

defendant's financial disclosure.  We were a little surprised

that he was found eligible for appointed counsel.  We're not

going to challenge that, that's in the discretion of the Court,

but he disclosed in his pretrial services report that he has at

least $50,000 in cash, and this goes to your Honor's

question -- not in cash, I'm sorry, in a bank account, in a

JAOPLIMC

checking account.  And this goes to your Honor's question about the means to flee.

Going to the Greek consulate or embassy and getting a new passport and buying a plane ticket to Greece would hardly cost $50,000.  And again, your Honor, as we stated in the prior proceeding, we don't have evidence that this defendant specifically had in his possession false identity documents, but that's the nature of the scheme.

At one point in defense counsel's letter, he says there's no allegations of identity theft or impersonation. He's charged with aggravated identity theft.  Yes, he did not, as far as we know, actually hold a passport in another name with his picture on it, at this point, but he likely had no reason to.  He was able to reside here lawfully and travel freely.  He no longer can do that.

Now he has the incentive to use his network to obtain those documents that we know, because we've intercepted them and had cooperating sources tell us about them and their availability to other members of the same organization.  Of note, in the search warrant that was executed at Mr. Limberatos' home, and I note the photos we offered both at the bail hearing and some then additional ones from the search warrant during -- in our letter are just a few of literally over 500 photographs that were taken of evidence in his home. This is just a few from ones that law enforcement had the

JAOPLIMC

1    chance to look through and analyze.

2            The amount of evidence gathered from his home was

3    overwhelming and voluminous.  There was a package in his home

4    that was shipped to another address, not his home address, that

5    bore the name that is listed in the indictment as his alias.

6    It was shipped to not his name, but his alias.

7            This is someone who is using a false name recently as

8    part of committing this crime, and again, is charged with

9    aggravated identity theft.  It is not a leap to think that he

10   would have access to be able to procure or be able to

11   manufacture a false identity document that would assist him in

12   traveling.

13           Finally, your Honor, another -- I think it's just an

14   error in defense counsel's submission.  On page 4, they state

15   that two percent of non-citizens who are placed on electronic

16   monitoring became fugitives and cites the bail hearing.  If

17   your Honor looks at the transcript, which I'm sure your Honor

18   did, on page 21, that is not the statistic that's offered.

19   It's not of non-citizens.  It's two percent of the defendants

20   who are placed on electronic monitoring.  There is no mention

21   of whether they are citizens or non-citizens.

22           Many non-citizens are detained pending trial in a

23   variety of types of cases where they're charged with aggravated

24   felonies for precisely the reasons that we're stating here.  I

25   don't have in front of me what the percentage of people placed

JAOPLIMC

1    on electronic monitoring are, in terms of their citizenship,

2    but it would not be a leap to infer that many of them probably

3    are citizens, like Paulino, because many non-citizens are

4    detained pending trial, like the defendant.

5            In addition, and I think I noted this at the bail

6    hearing before the Magistrate Judge, the government's position

7    is that the court, the magistrate judges and the district

8    judges in this district generally get it right with respect to

9    detention.  Sometimes they don't, in our view, but they

10   generally do, and that's why the rate of people fleeing is

11   fairly low.  It's not because people don't want to flee.  It's

12   that the people like Mr. Limberatos, who have the means, the

13   incentive, the ability and a place to go, are detained.

14           Two more points -- I'm sorry, one more point in

15   response and then, your Honor, I have to answer any of your

16   questions, which is -- and defense counsel made this argument

17   at the prior bail hearing as well.  Well, we don't really know

18   what's in these pictures, and that's just false.  The

19   government knows what's in the pictures from his house.  We

20   know what we seized.  It looks like other evidence that's been

21   seized and viewed in the course of this investigation.

22           We have law enforcement witnesses who will and can

23   testify about what those items are.  They are items that are

24   used either potentially for use or, for many of them,

25   exclusively for ATM skimming.  They are advanced technology.

JAOPLIMC

1   They are sophisticated technology, and there is no other

2   purpose to have some of those things than to participate in the

3   crime that's charged.

4          The fact that one cannot look at a circuit board or a

5   deep-insert ATM skimmer and know, as a layperson or as a

6   defense attorney, oh, that's a deep-insert ATM skimmer, instead

7   of a firearm, in the example that I think defense counsel gave

8   or drugs, is of no moment.  We know what those are.

9   Mr. Limberatos knows what those are.

10         Defense counsel hasn't suggested that any of the items

11  are not what they appear to be, or what the government says

12  they are, and certainly the burden is not on him, but we think

13  the government should credit -- I'm sorry, we think the Court

14  should credit the government's proffer of what we seized and

15  what those items are.

16         Your Honor, I'm happy to answer any other questions

17  the Court may have.  Otherwise, we'll rest on our papers.

18         THE COURT:  Thank you.

19         MR. SOBELMAN:  Thank you.

20         THE COURT:  Mr. Commissiong?

21         MR. COMMISSIONG:  Good morning, your Honor.

22         THE COURT:  Morning.

23         MR. COMMISSIONG:  I think that my first point, your

24  Honor, is he's here.  He's right here, sitting before your

25  Honor in this courtroom, and although the government said that

JAOPLIMC

1   your Honor should give no weight to the fact that he will

2   attend this court conference, she has, and he was actually

3   early, your Honor.  Your Honor should put full weight on the

4   fact that he's here, the fact that he is attending this court

5   conference, the fact that he is fulfilling the very

6   responsibilities that the government said that he would not.

7           Your Honor, the government stated that, as a rule,

8   Greece will not extradite Greek nationals.  Well, that's a bit

9   inaccurate.  Greece won't extradite Greek nationals unless

10  there's a bilateral agreement, and I believe I cited to a

11  bilateral agreement that the State Department has on their

12  website.  United States and Greece, they have a bilateral

13  agreement regarding extradition.  So any issue -- if, if, if

14  that were to come up, there is an extradition agreement between

15  the United States and Greece.

16          Your Honor, the government mentioned that his

17  daughters could easily relocate.  Your Honor, how many

18  hypotheticals are the government going to come up with in order

19  to have Mr. Limberatos detained?  They can come up with as many

20  hypotheticals as they want.  Your Honor, they are just

21  hypothetical.  They're not backed up by any facts.  They're not

22  backed up by any statistics.  They're not backed up by any

23  studies whatsoever, and I think that this is a good segue for

24  me to get into a stat that the government believes I misquoted.

25          That stat was a stat that I got from pretrial

1    services.  I called Francesca Miller from pretrial services and

2    asked specifically about the statistic that she provided to the

3    Court on October 10th during the bail hearing before Judge

4    Wang, and she -- and I could be wrong.  I will leave myself

5    open to that, but the statistic was, based on the question that

6    Judge Wang asked, was with respect to the percentage of

7    non-citizen defendants that become fugitives, and that number

8    is less than two percent.

9           Your Honor, the government, in their motion and here

10   today, cited cases, cited recent cases where individuals fled,

11   and I addressed those cases in my motion.  There have been

12   studies, actual studies done with actual hard statistics saying

13   people in drug cases are 78 percent more likely to flee than

14   people specifically in theft and fraud cases.  The government

15   referenced the case of Rosa Rodriguez, where Ms. Rodriguez fled

16   just last week.  That's another narcotics case that falls

17   squarely within the statistics provided by the administrative

18   office of the courts.

19          With respect to the case before Judge Cote, I think

20   that that just goes back to the fact that there's a bilateral

21   agreement regarding extradition between the United States and

22   Greece, and the government wasn't able to come up with any more

23   facts regarding property, regarding family, and children.

24          While we know that Mr. Limberatos is a property owner

25   here in the United States.  He runs a business here in the

JAOPLIMC

1    United States.  He has two daughters, and he lives with his

2    daughters, along with their mother, Ms. Flora Perrotta, here in

3    the United States.  They go to school here in the United

4    States.  They have a life here in the United States.

5         I referenced one of his daughters and some medical

6    issues she has.  That's important.  That's something that the

7    government just hasn't considered, hasn't taken into account,

8    but that, along with all the other things that we've mentioned,

9    those represent significant ties to the community, significant

10   ties that will keep Mr. Limberatos here in the United States,

11   keep him coming back to court, keep him fulfilling his

12   responsibilities because in fulfilling his responsibilities to

13   your Honor and to this court and to this system, he's

14   fulfilling his responsibilities to his family, your Honor.

15        The government made an issue in their motion and here

16   this morning with respect to him having -- it's not a leap, I

17   think they said, it's not a leap for someone who participated

18   in a case like this to then obtain or create a false passport.

19   I think it's a bit of a leap, your Honor.  I think it's a bit

20   of a leap, I think, when they haven't charged him, they haven't

21   indicated that he's used a false identity to acquire something

22   or to go somewhere or to travel.  They haven't indicated

23   anything like that.  This is another one of the government's

24   hypotheticals that they're coming up with.  It's a stretch,

25   your Honor, to convince your Honor that Mr. Limberatos should

JAOPLIMC

1   be detained.

2           With respect to the materials found in his home, your

3   Honor, law enforcement may have taken a look at those

4   materials.  Defense counsel hasn't.  We've seen pictures.  We

5   haven't seen what the actual materials are, and I won't call

6   them evidence here in the courtroom, your Honor.  As far as I

7   know, those are just materials.  The government can call it

8   evidence, if they like, but those are materials that were found

9   in his garage.  We don't know what their use is.  We don't know

10  what they are.  We don't know whether we'll need expert

11  testimony to say what these electronic parts are, these

12  electronic pieces, what machines, if any, these things are.

13  And unless law enforcement are now going to say that they're

14  some sort of engineers, I don't see how law enforcement can say

15  what these things are either.

16          Other than that, we'll rest on our motion, unless your

17  Honor has any questions.

18          THE COURT:  Not at this time.  Thank you.  Before I

19  let the government reply, if it wishes to, Mr. Rothman, do you

20  have any knowledge of the statistics regarding flight by

21  non-citizens who are released on monitoring?

22          MR. ROTHMAN:  I don't have any specific statistics in

23  front of me to quote from this morning, but as the lead

24  specialist for location monitoring in the office, I do know

25  that our fugitive rate is fairly low.

JAOPLIMC

1          THE COURT:  Thank you.

2          MR. ROTHMAN:  You're welcome.

3          THE COURT:  And that's overall fugitive rate, citizens

4     and non-citizens?

5          MR. ROTHMAN:  Correct.  That are placed on location

6     monitoring.

7          THE COURT:  Thank you.

8          Mr. Sobelman, this bilateral agreement.

9          MR. SOBELMAN:  Very briefly, your Honor.  I have not

10    reviewed the bilateral agreement, but I did review -- my

11    understanding is that Judge Cote yesterday found exactly what I

12    expressed to your Honor, which is that even someone who is not

13    a Greek citizen could go to Greece, become a citizen and would

14    not be subject to extradition pursuant to the arrangement.

15          The bilateral treaty doesn't mean that they will

16    extradite anyone that we want them to.  We have bilateral

17    treaties with I think over a hundred nations and many of them

18    have restrictions, including not being able to extradite

19    citizens of that country to the United States.  It might only

20    apply to others, but the point is this, Greece still has --

21          THE COURT:  Do you know whether the bilateral treaty

22    was even argued in front of Judge Cote, or whether she examined

23    that?

24          MR. SOBELMAN:  I don't, your Honor.  I would need

25    to -- if that's going to be material to your Honor's decision,

JAOPLIMC

```
1    we would ask for additional time in order to have someone

2    advise us more specifically on that, but our understanding is

3    exactly what I expressed, which is that was what Judge Cote

4    found yesterday and that that is a firm basis.

5              THE COURT:  What else do you have?

6              MR. SOBELMAN:  Your Honor, very briefly.  Again, page

7    21 of the transcript in front of Judge Wang makes very clear

8    that the question was not about non-citizens.  There's no

9    mention of non-citizens, lines 6 through 12.

10             THE COURT:  Mr. Commissiong, I think, proffered that

11   he had a separate conversation with pretrial services about

12   non-citizens and came up with that number.  That's his proffer.

13             MR. SOBELMAN:  I have no reason to think that

14   Mr. Commissiong would mislead the Court.  I would suspect that

15   the numbers for citizens versus non-citizens are different just

16   based on their incentives to flee, and the two percent that was

17   given by the pretrial services officer, when there was no

18   question about non-citizens, likely applied to everyone.

19             But regardless, I think the government's main point,

20   which we've made, is that the court generally gets it right.

21   Just because there is a small number that flees, we don't want

22   Mr. Limberatos to be part of that number.  We don't ask to

23   detain every defendant, in general, or in this case.  There are

24   even some non-citizens in this case that we agreed to bail for

25   because their circumstances are just very different than
```

JAOPLIMC

1    Mr. Limberatos'.

2              We've only asked for detention to your Honor for three

3    of the 17 that were arrested.  One, of course, consented to

4    detention.  We are being very careful here and not asking

5    because if it's not something that we aren't genuinely deeply

6    concerned about.

7              With respect to theft and fraud cases not leading to

8    as many flights, we have no doubt that's true because generally

9    narcotics offenses carry much higher penalties and mandatory

10   penalties than theft or fraud cases.  But here, unlike many

11   fraud cases, including in which Judge Cote detained the

12   defendant yesterday, there is a mandatory minimum sentence of

13   two years that would run consecutive to any other sentence that

14   would be imposed.

15             As we talked further in our letter, the guidelines

16   range is very high.  The government would calculate it in being

17   in excess of ten years, and that's without factoring in the

18   enormity of the evidence that was gathered from Mr. Limberatos'

19   home.

20             THE COURT:  So when you say in excess of ten years,

21   you're referring to the 108 to 135 range?

22             MR. SOBELMAN:  Yes, your Honor.

23             THE COURT:  Plus two years.

24             MR. SOBELMAN:  Plus two years.  Most fraud offenses,

25   in this district and elsewhere, carry a lower guidelines range

JAOPLIMC

1    than that.  Not all fraud offenses are equal, and this one is

2    particularly serious.

3          In addition, and finally, Mr. Commissiong says, well,

4    he owns a home.  Well, your Honor, we filed a bill of

5    particulars in this case and intend to forfeit his home because

6    we have substantial evidence that it was purchased and funded

7    with proceeds of crime.  So if the defendant loses this case,

8    whether by plea or trial, we intend to forfeit that home.  He

9    will not have that home, and we don't think that should be in

10   the column in his favor in this bail proceeding.

11         With that, your Honor, I'll be happy to answer any

12   additional questions your Honor may have.

13         THE COURT:  Thank you.  Well, the extradition issue is

14   important, and so I want supplemental information on that.

15         Mr. Commissiong, if you are able to and wish to

16   further parse your statistics on non-citizens, you can do that

17   in a supplemental submission as well.

18         So what I propose is to hold this appeal under

19   advisement to require that any supplemental submissions be made

20   by Monday, and to continue the current bail conditions pending

21   receipt of the supplemental submissions and a decision that I

22   will make based on the papers.

23         MR. SOBELMAN:  Your Honor, we'd be happy to do it on a

24   tighter schedule, if your Honor wished, but we are fine with

25   that schedule if your Honor wishes.  I think we could probably

JAOPLIMC

1    get back to you on the extradition issue within an hour.  I

2    just need to call the assistant that handled that case and have

3    them cite me the provision.

4            Obviously, we would defer to the Court on timing.  We

5    genuinely are concerned that he is a flight risk and would

6    prefer that, if your Honor is even considering detention, that

7    the issue get resolved sooner rather than later.

8            MR. COMMISSIONG:  Your Honor, Monday is fine.

9            THE COURT:  Well, how much time do you need to tighten

10   up your statistics?  Based on his proffering, I'm going to

11   require the government put its letter in by 9:00 tomorrow

12   morning, and I'll give you until noon to respond, if you want.

13           MR. COMMISSIONG:  I'd prefer -- if they're going to

14   get a submission in by tomorrow, I'd prefer Monday.

15           THE COURT:  Why?  It's not a question of preference.

16   It's a question of necessity that I'm asking.

17           MR. COMMISSIONG:  Well, I have no idea what -- you

18   know what, your Honor, if your Honor prefers, I'll get

19   something in by tomorrow.  Can I respond to them by the end of

20   the day tomorrow?

21           THE COURT:  Well, I would like to be in a position to

22   make a decision tomorrow before the end of the day.

23           MR. COMMISSIONG:  Okay.

24           THE COURT:  And so 9:00 a.m.  Noon.  And you can

25   certainly start preparing your position before you see this

JAOPLIMC

 1   letter.

 2                MR. COMMISSIONG:  Yes, your Honor.

 3                THE COURT:  All right.  And Mr. Limberatos is under

 4   restrictions.  Those restrictions continue in every particular

 5   until I make this determination.  So do you understand that,

 6   Mr. Limberatos?

 7                THE DEFENDANT:  Yes, your Honor.

 8                THE COURT:  Thank you.  So I will assume

 9   Mr. Limberatos' prompt availability, should I make a

10   determination that requires him to submit to detention.

11                MR. COMMISSIONG:  Yes, your Honor.

12                Just one thing.  You mentioned in the motion that I'm

13   working with him to obtain the confession of judgment with

14   respect to his property.  Should I -- I guess the proper

15   procedure would be to hold off until your Honor's determination

16   tomorrow?  Because he has to sign the affidavit, and then we

17   have to get it docketed in the local courthouse in Suffolk

18   County where the property is.

19                THE COURT:  Well, I think you should have the

20   paperwork all queued up to be able to comply promptly.  There's

21   no reason to stop preparing your paperwork.

22                MR. COMMISSIONG:  Okay.

23                THE COURT:  It makes sense not to file it before I

24   make my decision, but I don't want you to say, okay, it will

25   take me another three days to put the paperwork together and

JAOPLIMC

1    I'll file it next week if there's no need for that.

2              MR. COMMISSIONG:  The paperwork is ready, and he just

3    has to sign, that's all.

4              THE COURT:  All right.

5              MR. COMMISSIONG:  Thank you, your Honor.

6              THE COURT:  So get that queued up, and if it doesn't

7    need to be filed, it won't be filed.

8              MR. COMMISSIONG:  Okay.

9              THE COURT:  All right.  Thank you, all.  Is there

10   anything else that we need to take up together?

11             MR. SOBELMAN:  No, your Honor.  Thank you.

12             THE COURT:  Okay.

13             MR. COMMISSIONG:  Thank you, your Honor.

14             THE COURT:  Thank you.  We are adjourned.  Keep well.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25